Motion to dismiss denied February 17, 1960, argued February 8,
affirmed as modified March 8, 1961

## BERLINER AND SCHNITZER v. ROBERTS

349 P. 2d 498
360 P. 2d 533

Morgan S. Pritchett and Graham Walker, Portland, for the motion.

Reiter, Day & Anderson, Portland, contra.

LUSK, J.

The respondent has moved to dismiss the appeal on the ground that the notice of appeal was not served within the time provided by statute. The judgment from which the appeal was taken was entered December 1, 1959, and notice of appeal was served on the respondent on January 12, 1960, and filed with the clerk of the trial court on January 13, 1960.

■ Formerly a party had sixty days from the entry of a judgment in which to take an appeal. ORS 19.030 (2). This provision was amended by Oregon Laws 1959, ch 558, § 4 (1), now ORS 19.026 (1), which reads: "Except as provided in subsections (2) and (3) of this section, the notice of appeal shall be served and filed within 30 days after the entry of the judgment appealed from." The exceptions are not now material. The section is part of a revised code of appellate procedure, ORS 19.005 to 19.190, which was approved by the governor May 25, 1959, and became effective January 1, 1960. Oregon Laws 1959, ch 558, § 52.

The question is whether the statute was intended to be given retroactive effect; that is to say, whether the thirty day limitation of time in which to take an appeal should be applied to a judgment in existence on the day of the effective date of the act or whether the former statute, allowing sixty days, governs. If the former, the motion must be allowed; if the latter, appeal was taken in time.

The general rule with respect to the repeal of a law conferring jurisdiction is thus stated in *State v. Ju Nun*, 53 Or 1, 8, 97 P 96, 98 P 513: "It is settled that

the repeal of a law conferring jurisdiction takes away all right to proceed, under the repealing statute, as to all actions, suits or proceedings pending at the time of the repeal, unless there is a saving clause in the repealing statute, and this is so in an appellate as well as the court of original jurisdiction." See, also, *Brown v. Irwin, Executrix*, 187 Or 462, 474, 212 P2d 729; *Libby v. Southern Pacific Co.*, 109 Or 449, 219 P 604, 220 P 1017. In the case last cited, it was held that a statute limiting the right of appeal in actions at law to cases in which the amount in controversy exceeds $250 applied to pending appeals. In the opinion on petition for rehearing, 109 Or at 461, it was said, "To make our position absolutely clear we will say that, if the case had been properly appealed and set down regularly for trial, and in the meantime the act cited had gone into effect only one day before the date appointed for hearing, that fact would have ousted us of jurisdiction to hear the appeal * * *." See, also, *Moss v. Woodcock*, 109 Or 597, 220 P 1017; *Railroad Co. v. Grant*, 98 US 398, 25 LEd 231. A like holding is to be found in *Brown v. Irwin, Executrix*, supra, in which a statute abolishing the right to appeal from certain orders of the circuit court for Multnomah County sitting in probate was held applicable to pending cases.

The only cases decided by this court involving a reduction in the time allowed for taking an appeal are *Columbia City Land Co. v. Ruhl*, 70 Or 246, 134 P 1035, 141 P 208, and *Walling v. LaFollette*, 76 Or 497, 134 P 1192. These cases construed Oregon Laws 1913, ch 319, which reduced the time for taking an appeal to the supreme court from six months to sixty days. The statute provided, however, that "in all cases where the right to appeal to the Supreme Court shall exist at the time this Act shall come into force, the time for taking

such appeal is hereby extended for the period of sixty (60) days thereafter." As a result of this provision, of course, no such question as that presented by the present motion could arise.

Notwithstanding such decisions as *Libby v. Southern Pacific Co.*, supra, involving a complete withdrawal of jurisdiction, it is quite generally recognized that a statute reducing the time for taking appeals will not be given a retrospective effect unless a contrary intent plainly appears. The rule is thus stated in 4A CJS, 74, Appeal and Error § 430:

> "Unless an intention plainly appears that the statute is to receive a retrospective operation and effect, ordinarily it is held that a statute which curtails or reduces the time does not apply to proceedings in which a judgment, order, or decree has been previously rendered or entered."

See, also, 3 Am Jur 145, Appeal and Error § 426; 51 LRA(NS) 761; *Pignaz v. Burnett*, 119 Cal 157, 51 P 48; *Rogers v. Trumbull*, 32 Wash 211, 73 P 381; *Cook v. Massey*, 38 Ida 264, 220 P 1088, 35 ALR 200; *Raddatz v. Christner*, 103 Neb 621, 173 NW 677; *City of Plankinton v. Kieffer*, 69 SD 597, 13 NW2d 298; *Jackman v. Atchison, T. & S. F. Ry. Co.*, 22 NM 422, 163 P 1084; *City of Raton v. Seaberg*, 39 NM 544, 51 P2d 606 (Rule of Court); *Rolater v. Strain*, 31 Okla 58, 119 P 992; *McClendon v. Boyd Construction Co.*, 224 Miss 365, 78 So2d 796.

In some cases where the courts have held that the statute did not operate retrospectively, an exception has been recognized which may be illustrated by the following example: If, in the present case, the right of appeal under the old law extended more than thirty days from the time the act took effect the statute would

limit the remaining time to thirty days after its taking effect. *Rogers v. Trumbull*, supra, and *Wilson v. Kryger*, 26 ND 77, 143 NW 764, 51 LRA(NS) 760. We are not, however, met by that problem in the instant case, as the appeal was filed not only less than sixty days after the judgment but within thirteen days after the effective date of the statute.

Our attention is called to Section 45 of the 1959 Act, which reads:

> "In every case in which a notice of appeal has been filed prior to the effective date of this act the appeal shall be conducted, heard and determined in all respects as though this act did not exist."

It is apparently thought that this provision indicates a legislative intent to apply the new thirty day time limit retrospectively. We do not find in it any such meaning. The provision seems to have been adopted merely as a convenient cutting off time for the governance of this court and the circuit courts in applying other provisions of the new statute, and to obviate questions that might arise as to the applicable law regarding the making up of the record, etc., in the case of appeals commenced before January 1, 1960, but still not completed after that date. In such a case the provisions of the former statute would apply, whereas in a case like the present, in which the notice of appeal was filed after January 1, 1960, the 1959 act governs the subsequent proceedings, notwithstanding the fact that notice of appeal was given pursuant to the provisions of the former statute. An examination of the entire statute fails to disclose any provision which indicates that the statute was intended to operate retroactively.

The motion to dismiss is denied.

Carlton R. Reiter, Portland, argued the cause for appellants. On the briefs were Reiter, Day & Anderson and Robert C. Wall, Portland.

Graham Walker, Portland, argued the cause for respondent and cross-appellant. With him on the brief was Morgan S. Pritchett, Portland.

Before McALLISTER, Chief Justice, and ROSSMAN, PERRY and GOODWIN, Justices.

GOODWIN, J.

This is an appeal from a decree in equity based on the findings of a referee in a suit for an accounting,

dissolution of a partnership, and general relief. The plaintiffs appeal and the defendant cross-appeals.

The partners will be referred to as Berliner, Schnitzer, and Roberts. This partnership acquired the assets and liabilities of an earlier partnership between Berliner and Roberts. That partnership is the subject of other litigation, also pending in this court. By stipulation, the transcripts of proceedings in both cases have been made a part of the record in this case.

A condensed history of the Berliner, Schnitzer, and Roberts partnership requires reference to the earlier partnership. In February 1955, Gustave Berliner learned of an opportunity to manufacture and sell 74,000 spruce floats under a contract for the ultimate use of the United States Navy. Earl Roberts, who was doing business as an individual under the name Roberts Myrtlewood Factory, owned a shop and part of the necessary machinery for the manufacture of the floats. The floats were to be of kiln-dried spruce blocks manufactured to exacting specifications so that they could be processed further as flares for use in air-sea rescue operations. The immediate customer for the floats, so far as this case is concerned, was Kwikset Lock Co., which will be referred to hereafter as Kwikset. Berliner and Roberts decided to form a partnership for the purpose of supplying the floats pursuant to a purchase order Berliner had obtained for Roberts from Kwikset. Berliner, individually, had other dealings with Kwikset which are not material to this controversy.

On February 24, 1955, Berliner and Roberts made a memorial of their partnership by executing an agreement prepared by Roberts on a sheet of Roberts' let-

terhead. This one-page instrument, prepared without legal advice, was the seminal event in at least five cases in the circuit court and three appeals to this court. It recites that Roberts has secured an order from Kwikset through Berliner's help and that Berliner is "entitled to one-third of the profits or losses" from the enterprise. Roberts received a two-thirds interest. The agreement also obligates Berliner to furnish whatever working capital may be necessary, not to exceed $30,000, to "tool up, secure materials, pay labor, etc." It was apparently understood, though not expressed, that Roberts would furnish the plant, together with such machinery as he had on hand, and would perform most of the services in connection with the manufacture of the spruce floats.

After the execution of the above-described contract, Roberts entered into agreements with third parties for the manufacture of the spruce floats. His plans did not work out. After sustaining financial losses, the venture was in need of new capital. Accordingly, on June 22, 1955, the partnership now before the court was formed. The agreement of the new partnership was not recorded in written form until July 18, 1955. This writing was prepared by a lawyer, although not one of the lawyers presently employed by the parties in this litigation.

■ The agreement recites that the parties are engaged in the manufacture of 74,000 spruce float bodies and that each partner has an interest equal to one-third of the profits from the enterprise. It further recites that the parties are tenants in common of certain personal property listed on an attached sheet marked Inventory "A". This recital is apparently an expression of a "contrary intention" under ORS 68.130 (2). Ordinarily property brought into a partnership by

the partners is partnership property under that section of the Uniform Partnership Act.

The agreement obligated Roberts to furnish the labor and factory space for manufacturing and storing the materials necessary to carry out the contemplated business. Roberts also undertook to furnish maintenance for the items of tools and equipment listed in an attached Inventory "B". This inventory apparently consisted of machinery owned by Roberts but treated as partnership property for certain purposes in the agreement.

In addition to segregating certain items of tools and machinery into inventories "A" and "B", the partners expressed an intention to permit Roberts to use the items listed in Inventory "A" during the life of the partnership. Roberts was to pay no rent to the tenants in common. He was, however, to pay for any repairs or replacement made necessary through the fault of Roberts as distinguished from reasonable usage and wear. Ordinary maintenance would be charged to the partnership.

To further complicate the rights of the parties in the various items of real and personal property which were to be used in the partnership, the partners agreed to make extensive permanent improvements on Roberts' land which would remain a part of the land upon the termination of the partnership. In making this agreement, the only provision for controlling the expenditure of partnership funds was a general requirement that accurate and complete books of account be kept by the partnership. This provision, however, was frequently ignored. When the partnership eventually fell upon evil times, the records were far from complete.

An oversight in the making of the new partnership agreement on July 18, 1955, was the failure to have an accounting, or even an accurate set of books carried forward from the old partnership. It will be seen that this oversight was significant in view of the following paragraph of the agreement of July 18, 1955:

"(11) All moneys *heretofore* or hereafter loaned or advanced to the partners for working capital or for any of the purposes of this agreement by any of the parties hereto shall be repaid to the party loaning or advancing the same before any distribution of profits, as fast as the finances of the partnership will permit as determined at the discretion of Gustave Berliner * * *." (Emphasis supplied.)

Prior to the dissolution of the first partnership, Roberts had borrowed $10,000 from Kwikset on his personal note. This money, or at least a major portion of it, was expended in the partnership business before the new partnership was formed in June of 1955. Whether or not this money was a loan to the old partnership, as Roberts contends, or a contribution to capital, as Berliner contends, was the primary issue in a separate case in the circuit court and now pending in this court. It is not necessary to decide the nature of the advance of the $10,000 at this time, however. It is only necessary to observe that there were unsettled questions arising out of money paid into the former partnership when the agreement of July 18, 1955, was executed by the partners.

Perhaps some of the unconcern with books and records which all the partners displayed can be explained by hindsight. The prospects were still bright in June 1955 that the partnership would earn large profits from then anticipated sales. None foresaw that the manufacture of spruce floats under climatic

conditions in Oregon would produce a distressing number of rejected units at a naval air station in the Mojave Desert. Splitting and checking of the wood on a massive scale turned the expected profits into losses.

The ambiguities in the relationship of the partners, which might have survived prosperity, did not survive adversity. The downfall of the partnership produced the multiplicity of lawsuits we have noted. The transcript of the proceedings in the case at bar contains numerous cross-references to testimony in other cases. The scores of exhibits bear so many identification numbers that it is difficult to relate them to the testimony. Faced with such raw data, the referee below attempted to construct a set of books for the first partnership as well as an accounting for the second.

Counsel for the appellant stated in oral argument: "basically the referee's findings, with what he had to work with, * * * are correct." We agree.

It is necessary to advert to the referee's findings in the first partnership in order to determine which assets and liabilities of the first partnership were carried into the second. The referee found that there existed a net loss of $14,375.80 when the old partnership was dissolved and the new one formed. This loss the referee apportioned one-third to Berliner and two-thirds to Roberts, as provided in their original agreement. The referee's report was supported by the evidence. The facts are not seriously in dispute.

The new partnership was formed with only a vague, if any, understanding of the condition of the accounts in the old partnership. The record shows that Roberts had personally borrowed $10,000 and had deposited some $7,000 in the account of the first partnership, using the balance for partnership purposes. Berliner

had made a net contribution of capital in the amount of $24,093.09. The referee designated Roberts' full $10,000 as a contribution to capital. It is conceded that the full amount was spent in the partnership business, but Roberts contends that it was a loan.

If Roberts' $10,000 was a loan to the first partnership, then he was its creditor in that amount. ORS 68.620 (2) (b). If the $10,000 was a contribution to capital, then Roberts' share in the winding up of the first partnership would be his share in the capital account after all liabilities to creditors have been paid. ORS 68.620 (2) (c). No winding up was accomplished and the new partnership carried all the problems forward.

When the second partnership was formed, Schnitzer paid in $6,000, which was later returned to him. There is no dispute about Schnitzer's role. For all practical purposes, Schnitzer's only interest in this appeal is in his ultimate contribution to pay his share of the liabilities. All three partners agreed that they would share equally in profits and losses. This agreement was apparently made despite the fact that Berliner had contributed some $24,000 to keeping the venture afloat, and Roberts had contributed the use of his woodworking factory and had either contributed or loaned $10,000 to the venture. In any event, the new partners commenced operations as equal partners subject to the condition of their capital accounts under the written memorandum of July 18, 1955.

Roberts continued the manufacture of floats until March 15, 1956, when he stopped production. A dispute arose over the stoppage of production. The partnership was dissolved. At this time, Kwikset had accepted 67,400 floats and had rejected some 13,256 as

unfit for its purposes. The original purchase order called for 74,000 acceptable floats.

Berliner then undertook to manufacture the balance of the order without further participation by Roberts. This activity produced litigation over the possession of certain tools and machinery. Roberts was successful in the litigation. Attorney's fees were incurred. Roberts' attorney's fees are charged to the partnership in the accounting made by the referee. Berliner and Schnitzer appeal from that portion of the decree which allowed Roberts a credit for attorney's fees.

■ It will be remembered that the partners had segregated certain equipment into inventories "A" and "B". Berliner obtained possession of certain equipment listed on one or both inventories. To do so he employed an action of claim and delivery against Roberts, under ORS 29.810 et seq. Berliner's attorney had done other work for the partnership for which he had been paid. The record shows that the partnership was billed $925 for services in the action of claim and delivery. The attorney was allowed $650 by the referee. This was paid by the partnership. Roberts defended the action in his own name, but contends that his attorney's fees of $700 were a proper charge against the partnership because they were incurred in defense of partnership property. The referee allowed attorney's fees to both sides in the final accounting of the partnership. We believe the referee correctly analyzed the facts and that no error was made in allowing the claimed fees as partnership expenses. This part of the appeal is without merit.

In the meantime, Roberts asserted a claim against Kwikset for $47,126.27. It is not clear whether this claim was initially asserted on behalf of the partner-

ship, which had been dissolved, or on Roberts' own behalf. When it went to court, Roberts was the sole plaintiff. In any event, both Berliner and Schnitzer disclaimed the validity of Roberts' demand against Kwikset. Berliner and Schnitzer each gave Kwikset a covenant not to sue, for which Kwikset paid no consideration.

Berliner had other business connections with Kwikset which may have prompted his disclaimer, but he concededly received nothing either for himself or for the partnership. The referee made no finding of impropriety and we infer none. Schnitzer apparently followed Berliner's lead in the matter and likewise received no consideration for his covenant not to sue. Roberts contended that the floats had been manufactured according to Kwikset's specifications and that the large number of rejections came about through improper handling by Kwikset. Kwikset settled with Roberts before trial by cancelling the Roberts note for $10,000 and by payment of an additional $3,700 in cash to Roberts. This settlement with Roberts is the principal item in dispute in this appeal.

In the final accounting among the partners, the referee found that both Berliner and Schnitzer had forfeited any interest they might have had in a partnership asset when they made their separate peace with Kwikset. The referee did not necessarily rely upon estoppel, although it was urged by Roberts. The referee found that the two erstwhile partners had waived their shares of the claim against Kwikset.

Roberts further contends, in support of the referee's finding, that when one or both of the other partners undermined the partnership's bargaining position by making a separate settlement with Kwikset such partners should be estopped later to share in

the net settlement realized by the other partner who persevered in the claim. In *Fouchek et al v. Janicek,* 190 Or 251, 225 P2d 783, we suggested that inequitable conduct by a partner might, in a proper case, bar his right to an accounting. It is unnecessary to decide whether open and honest hostility might give rise to an estoppel in this case.

■ The appeal must fail because Berliner and Schnitzer waived their shares of the claim. Even though, as a general proposition, a partnership receivable collected after dissolution is a partnership asset to be accounted for in the winding up of the partnership, ORS 68.650, the rights of an individual partner in a particular asset, like other legal rights, may be waived. Waiver is the intentional relinquishment of a known right. *Wright et ux v. Hage et ux,* 214 Or 400, 408, 330 P2d 342.

■ The appellants attempt now to say that their waivers were a nullity because they had no legal right to compromise or arbitrate a partnership receivable. This is true as an abstract proposition. ORS 68.210 (3) (e). But the want of legal sufficiency in their waivers to bind the partnership does not deny the effect of the waivers upon their own interests. The appellants have cited no authority for the proposition that a person *sui juris* may not waive his interest in a partnership asset for reasons satisfactory to himself.

■ Had the partners either cooperated with Roberts in his attempt to collect the $47,126.27 claimed, or maintained a discreet silence while Roberts went about the collection, Roberts does not deny that they would be entitled to participate in the enhanced partnership assets. The record shows, however, that they actively sabotaged the collection effort. It is, of

course, impossible to determine now what the claim may have been worth. But it had some value. Thus their conduct as well as their words leave no doubt as to their intent to waive any interest they might have had.

To further remove doubt concerning their intentional relinquishment of a known legal right, Berliner and Schnitzer asserted in open court that the receivable was not a partnership asset, but was between Roberts and Kwikset. Having thus made their election in the trial below, it is too late now to call upon the aid of the Uniform Partnership Law to claim its benefits. The referee correctly found a waiver and we affirm his finding.

Our disposition of the item of attorney's fees and of the settlement by Roberts with Kwikset resolves the only substantial issues on this appeal.

The cross-appeal by Roberts presents questions which require us once again to consider the early beginnings of the present partnership. As noted earlier, the assets and the liabilities of the first partnership were carried into the second. The capital account of the first partnership was never reckoned until long after the second partnership was dissolved. The referee, in arriving at an accounting for the second partnership, carried forward both the capital assets and the capital liabilities from the first partnership.

■ The cross-appeal challenges the correctness of a number of items in the capital account in the second partnership. ORS 68.620 contains the rules for distribution under the Uniform Partnership Law, "subject to any agreement to the contrary." These rules are detailed and will not be set out here, as easy reference may be made to them in the code. The principal point urged on the cross-appeal is that the

agreement signed by the three partners on July 18, 1955, requires them to share equally in the ultimate distribution of remaining assets, if any, regardless of the condition of their individual capital accounts.

We hold that the provisions of paragraph (11) of the July 18, 1955, agreement, quoted elsewhere in this opinion, must be construed against the cross-appeal. While lacking in specific detail, the agreement contemplated that funds previously contributed to the first partnership would be taken into account in later accountings. Thus, the capital accounts of the partners in the new partnership reflect transactions involving the capital accounts in the old. After much sifting of records, the referee reconstructed the capital accounts of the first partnership in a manner that is free from substantial criticism. We find no merit in the cross-appeal with respect to the referee's treatment of the capital accounts.

■■ The cross-appeal also challenges the ruling of the trial court which approved the referee's allowance of $3,409.40 to Berliner as rental for certain tools and equipment used by the partnership prior to its dissolution. We have examined the record with reference to Berliner's claim for rentals. The claim is supported neither by the evidence nor by the partnership aggreement. Berliner withdrew enough money from the partnership to make the down payment in his own name for certain equipment. He thereafter withdrew rentals in sufficient amount to finish paying for the equipment. He contended that he was authorized to take this action. The evidence failed to disclose any such authority, expressed or implied. Ordinarily, when partnership funds are used to purchase tools and equipment for use in the partnership business, the property so acquired is partnership

property. ORS 68.130 (1). The referee's figures should be amended to show that the partnership was not chargeable for the rental received by Berliner. The ultimate disposition of the equipment does not appear in the record and is not involved in the cross-appeal. The rentals, however, are involved in the cross-appeal and can be adjusted in the final decree of the trial court.

■ The cross-appeal further challenges a ruling by the referee which excluded testimony concerning alleged profits made by Berliner in finishing the performance of the original contract with Kwikset after the partnership was dissolved. There was no foundation in the pleadings upon which the suit could be turned into a separate quest for an accounting of such profits. There was no allegation that such profits had been earned by Berliner. We find no merit in this part of the cross-appeal.

Other items in the accounting are challenged solely upon the mistaken theory that because the partners were equal partners they had equal capital accounts. As we have seen, this basis for challenging the referee's report is without merit. The referee correctly reconstructed the capital accounts from existing records of deposits and withdrawals. Under the provisions of ORS 68.620, equal partners share equally in distribution of assets only after liabilities, including those with reference to capital, are taken into account.

The decree of the lower court must be modified to disallow Berliner's claim for $3,409.40, or any sum, in equipment rentals. The cause is remanded for recomputation in accordance with the holding herein.

Affirmed as modified; no party to recover costs.